GONZALES v. ZURBRICK, District Director of Immigration et al.

No. 5665.

Circuit Court of Appeals, Sixth Circuit.

Dec. 11, 1930.

Catherine G. Herlehy and Mark W. Goodwin, both of Detroit, Mich., for appellant.

Stephen J. Carey, of Detroit, Mich., (John R. Watkins, of Detroit, Mich., on the brief), for appellees.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

HICKS, Circuit Judge.

Habeas corpus by Timotea Gonzales, alias Helen Gonzales, against Zurbrick, District Director of Immigration, et al. The alien was held by virtue of a deportation warrant. The District Judge dismissed the writ, and the alien appealed.

The alien, a Mexican twenty-five years old, the wife of Tranquillio Gonzales, lawfully entered the United States with her husband on December 16, 1926. Her husband abandoned her in 1927 at Pontiac, Mich. On March 14, 1929, the alien, with Hazel Thornton, an American, was arrested in a house at 58 Poplar street, Pontiac, in connection with a liquor raid and taken to police headquarters. There Immigration Inspector Yeager, through Alex. Le Doulx as an interpreter, conducted a preliminary examination to determine whether the alien was subject to deportation. Upon that hearing the alien was without counsel, and was not advised of any specific complaint against her or of the seriousness of the situation, that is, that if deported she would commit a felony if she attempted to return. Upon this initial examination the alien, answering through Le Doulx, twice denied that she was a prostitute, but her testimony in this connection contains the inconsistent statements that since she separated from her husband she had lived with one Ezekiel Ramidos for seven months in Buffalo, N. Y., and that she had undergone microscopic physical examinations "because they caught me in one of those houses." Upon this hearing Hazel Thornton was examined by Yeager and testified in English that she, herself, was a prostitute and had been for two years, and that she was arrested at 58 Poplar street, with the alien, who also lived there. The alien was then recalled and again questioned by the inspector through the interpreter, when the following colloquy occurred:

"Q. You have heard the testimony of Hazel Thornton in which she says she is a prostitute herself have you not? A. I was a prostitute also.

"Q. You now admit you were a prostitute also? A. Yes.

"Q. How long have you been practicing prostitution in the United States? A. Ten months.

"Q. Here in Pontiac? A. Yes."

Upon the record thus constituted, including the testimony of two police officers, which was chiefly hearsay, a warrant of arrest issued on March 16, 1929. The warrant charged that the alien (1) had been found to be receiving and sharing in or deriving benefit from the earnings of a prostitute; (2) that she had been found managing a house of prostitution, etc.; and (3) that she was a person likely to become a public charge at the time of entry. There was at that time substantially no fact foundation for any of these charges. She was not charged in the warrant with practicing prostitution. A hearing was had upon this warrant on March 27, 1929, when the alien was represented by counsel. Le Doulx was again offered by the government as an interpreter "because the alien was unable to speak and understand the English language satisfactorily." The alien complained that she could not understand Le Doulx. Thereupon another and then a third interpreter was substituted. Upon this hearing the alien denied that she had ever lived with a man in Buffalo; that she had ever been in Buffalo or that she had ever so sworn. She stated that she had worked for a man in a restaurant, but had never lived with any man other than her husband. She denied that she ever went to bed with a man for money, and said that she had intended to state on her original examination that she had worked for ten months in a boarding house instead of a house of prostitution. She stated that she understood the meaning of the word "prostitution" in Spanish, but that she had never practiced prostitution, and that she did not understand the questions of the interpreter Le Doulx upon the original ex-

amination. Upon this hearing the police officers were recalled and re-examined. We do not review their testimony in detail because upon habeas corpus we are not interested in its truth or falsity. It is relevant here only to the extent that it sheds light upon the fairness of the hearing. It is sufficient to say that the record thus made up was certified to the Department of Labor by Inspector Yeager with the recommendation that the alien be deported. The record then for the first time contained the charge that "the alien had been found practicing prostitution in the United States subsequent to entry." She was given formal notice of this charge at a hearing on April 17, 1929. Subsequently the case came before a Board of Review, which likewise recommended deportation. On May 29, 1929, the alien again brought the case before the board upon a motion to cancel the warrant, whereupon the board recommended that the case be reopened and that the District Director be requested to certify as to the competency of Le Doulx as an interpreter. The board found that the substitution of other interpreters for Le Doulx "gives some support to the claim that the alien did not understand all that had transpired at the preliminary hearing."

The case was reopened and the alien again examined. She substantially reiterated her testimony given on March 27th. She further stated that on the original examination there was no interpretation or translation of Hazel Thornton's testimony, and she did not and could not comprehend it. She repeated that she did not understand the meaning of the word "prostitution" as it was spoken by Le Doulx, but that she now understands it, and that she never practiced prostitution. In short, her insistence is that the incriminating statements appearing to have been made by her upon the primary examination were not true, but were caused by the incompetency of the interpreter. She further testified that the physical examinations made of her were incidental to seeking work in a restaurant, work which she did not obtain because of her inability to speak English. Subsequently Le Doulx was examined. He testified that he was a Frenchman, that he learned to speak "in Mexican" in Alexandria, Egypt, where he was a jeweler, and where he occasionally met Mexicans and persons of other nationalities who had resided in Mexico. He was subjected to both reading and speaking tests, from all of which, considered in connection with other testimony in the record, we con-

clude that he was unable to interpret the Mexican speech in a manner calculated to insure the alien a fair hearing. At an adjourned hearing before Inspector Gangewere, letters addressed to Inspector Yeager from certain police court attaches of Detroit recommending Le Doulx as a competent interpreter were introduced. These letters were objected to, but, assuming that they might be considered upon such a hearing, they are not convincing because they were written by Americans unacquainted with the speech or language of Mexicans.

 This being a proceeding by habeas corpus, we are without jurisdiction to determine whether the result (assuming that the hearing was fair) was right or wrong. Chin Yow v. U. S., 208 U. S. 8, 11, 28 S. Ct. 201, 52 L. Ed. 369; Ung Bak Foon v. Prentis, 227 F. 406, 409 (C. C. A. 7); Prentis v. Seu Leung, 203 F. 25, 27 (C. C. A. 7). We are limited to the question whether the alien was accorded a full and fair opportunity to be heard or, upon the other hand, whether there was such defect in the proceedings as might have led to a denial of justice or whether there was absent any element deemed essential to due process. Bilokumsky v. Tod, 263 U. S. 149, 157, 44 S. Ct. 54, 68 L. Ed. 221; Ungar v. Seaman, 4 F.(2d) 80, 82 (C. C. A. 8); Svarney v. U. S., 7 F.(2d) 515 (C. C. A. 8); The Japanese Immigrant Case, 189 U. S. 86, 101, 23 S. Ct. 611, 47 L. Ed. 721; Prentis v. Seu Leung, supra; Colyer v. Skeffington (D. C.) 265 F. 17, 77; Whitfield v. Hanges, 222 F. 745, 749 (C. C. A. 8); In re Chan Foo Lin, 243 F. 137, 143 (C. C. A. 6); Weinbrand v. Prentis, 4 F.(2d) 778, 779 (C. C. A. 6). See, also, I. C. Comm'n v. L. & N. R. Co., 227 U. S. 88, 91, 93, 33 S. Ct. 185, 57 L. Ed. 431. The principal criticism is upon the conduct of the preliminary hearing. The failure to advise the alien of her right to counsel and of the gravity of the charge would not invalidate the proceedings, Low Wah Suey v. Backus, 225 U. S. 460, 470, 32 S. Ct. 734, 56 L. Ed. 1165, nor does it matter that the warrant of deportation was based in part upon the charge that the alien was found practicing prostitution, a charge not found in the warrant of arrest, for, as indicated, she was upon the hearing given notice of this charge, Siniscalchi v. Thomas, 195 F. 701, 705 (C. C. A. 6).

 It is of course well established that procedure in deportation cases will not be subjected to technical tests, but, placing the case in a setting most favorable to appellees,

we cannot escape the conclusion that certain basic requirements were violated. If the alien's criticism of Le Doulx went no further than that on account of his defective speech she could not understand him, her attitude might be regarded as self-serving, or, if he were really competent, and if it should appear that a failure to comprehend was due to some disability of her own, then fairness required that reasonable steps be taken to facilitate understanding. But the record presents a situation of deeper significance.

Upon the hearing of March 16, 1929, Inspector Yeager recognized the alien's complaint by substituting another, and later a third, interpreter. As indicated, the Board of Review concluded that this action gave support to her claim and reopened the case, but, notwithstanding the evidence adduced upon the rehearing affecting the competency of Le Doulx, the alien was ordered deported upon a consideration of the whole record. The function of an interpreter is an important one. It affects a constitutional right. The right to a hearing is a vain thing if the alien is not understood. Deportation is fraught with serious consequences. Brown v. Zurbrick (C. C. A.) 45 F.(2d) 931, opinion this day filed. It is of vital concern not only to the alien but to the government as well, and it is not unreasonable to expect that, where the services of an interpreter are needed, his capability should be unquestioned. We do not regard the comment of Mr. Justice Harlan in The Japanese Immigrant Case, supra, an exclusion case, touching the alien's lack of knowledge of our language, as applicable, where a hearing is claimed unfair because of the incompetency of the government's interpreter.

Further, it occurs to us that, after the alien had at first denied that she was a prostitute, and afterwards had seemingly admitted that she was, it was unfair to have allowed the matter to rest there without having called her attention to this inconsistency and allowing her an opportunity to explain. Fair dealing suggests as much. Again the statement of Hazel Thornton given in English upon the preliminary hearing should have been fully explained to the alien in her own language, and she should have been afforded the opportunity to cross-examine. The right to cross-examine even in deportation proceedings is a constitutional one. Whitfield v. Hanges, supra; Ungar v. Seaman, supra; In re Chan Foo Lin, supra. See, also, I. C. Comm'n v. L. & N. R. R. Co., supra. While the alien did not request the right to cross-examine Hazel Thornton, it is hardly expected that this Mexican woman, unaided by counsel, would have made such request, nor do we think that the failure to demand such cross-examination rectified the error. The interest of truth clearly required that she be offered an opportunity to cross-examine. Maltez v. Nagle, 27 F. (2d) 835, 837 (C. C. A. 9); Svarney v. U. S., supra. Hazel Thornton was not present at any subsequent examination nor was her absence accounted for.

The result is that the writ of habeas corpus will be sustained. No question of citizenship is involved. The issues are of fact only, and the jurisdiction for their determination is in the immigration authorities. The case will therefore be remanded to the District Court with directions to discharge the alien unless such authorities shall give her a fair hearing within a reasonable time to be fixed by the court. U. S. v. Petkos, 214 F. 978, 980 (C. C. A. 1).