These exchanges strongly suggest that it was the interpreter, not Amadou, who was unfamiliar with the vocabulary.

Moreover, the trial transcript indicates that Hamadi specifically stated, through the same interpreter, that he and Amadou did not study Arabic at a school, but rather that "the set up is such that you have one tutor and all the kids who - - who he tutors goes to his home. You know it's his residence, it's not a school." J.A. at 71. This statement that Hamadi and Amadou were tutored in Arabic at a private home as adults is not inconsistent with Amadou's earlier statement that he did not attend school while in Mauritania -- a statement that the judge found not credible. Furthermore, during Hamadi's questioning, when the interpreter stated that he was going to ask Hamadi to repeat a response, the judge directed the interpreter to translate Amadou's responses even if they did not make sense. J.A. at 70.

In sum, the interpreter's admissions of difficulty understanding Amadou and the additional exchanges in Fulani between Amadou and the interpreter demonstrate that the capability of the interpreter was questionable. This Court established in *Gonzales* that where the capability of the interpreter is in question, an alien is denied his due process right to a full and fair hearing when he is ordered deported upon a consideration of the record as a whole. The immigration judge based her decision to deny Amadou's applications for asylum, withholding of deportation, and voluntary departure solely on her determination that Amadou's responses during the hearing rendered him not credible, and the Board of Immigration Appeals deferred to the judge's adverse credibility finding. *Gonzales* therefore mandates a finding that Amadou was denied his right to a full and fair hearing because the interpreter's questionable translations formed the basis of the Board's decision to deny his applications. We therefore **REVERSE** the Board's decision and **REMAND** this case with instructions that Amadou be provided a new hearing within a reasonable amount of time and with the assistance of an interpreter who speaks his Fulani dialect.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0312P (6th Cir.)
File Name: 00a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

MAMADOU AMADOU,
          *Petitioner,*

          *v.*                              No. 99-3824

IMMIGRATION AND
NATURALIZATION SERVICE,
          *Respondent.*

On Petition for Review of an Order of the Board of Immigration Appeals.
No. A73 624 555.

Argued: June 13, 2000

Decided and Filed: September 12, 2000

Before: JONES, BOGGS, and MOORE, Circuit Judges.

————————

**COUNSEL**

**ARGUED:** Bryan Scott Hicks, Cincinnati, Ohio, for Petitioner. Joan E. Smiley, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Respondent. **ON BRIEF:** Bryan Scott Hicks, Cincinnati, Ohio, for Petitioner. Joan E. Smiley, Karen Fletcher

1

Torstenson, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Respondent.

---

## OPINION

---

NATHANIEL R. JONES, Circuit Judge.    Petitioner Mamadou Amadou challenges the Board of Immigration Appeals' denial of his applications for asylum, withholding of deportation, and voluntary departure.  In denying Amadou's applications, the Board upheld the ruling of the immigration judge, who found Amadou not credible because of his alleged inconsistent testimony, dispassionate demeanor, and failure to establish conclusively his identity and citizenship.  Amadou asserts that he was prejudiced and denied his due process right to a full and fair hearing because the interpreter was incompetent.  For the reasons that follow we **REVERSE** the Board's decision and **REMAND** for a rehearing.

### I.

Amadou was born in 1965 and claims to be a citizen of Mauritania.[1]  He entered the United States on June 13, 1994 at New York City without valid entry documents. On August 15, 1996, Amadou was charged as a deportable alien under § 241(a)(1)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(1)(A).  Amadou applied for asylum on the grounds that he feared persecution if he returned to his native country.

A deportation hearing was conducted on May 6, 1997 with the aid of an interpreter fluent in English and Amadou's native language of Fulani.  Although Fulani is a common language in West Africa, it has many dialects.    The

---

[1]Amadou produced a document he claimed to be his birth certificate from Mauritania, but the document was not authenticated or translated in the record.

The record indicates that the interpreter's faulty translation directly prejudiced Amadou because the judge and Board denied his application based on the testimony at the hearing. The immigration judge cited the following factors in support of her conclusion that Amadou was not credible: Amadou's initial answer of "Senegal" in response to the citizenship question; his apparent unfamiliarity with the ethnic groups in Mauritania and the terminology associated with these ethnic splits; Hamadi's testimony that he studied Arabic with Amadou as a child even though Amadou should have been in his early twenties at the time and had indicated that he had not gone to school; Amadou's apparent inconsistency in describing the people who arrested his family, first as police, next as government officials, and later as government officials who were all white; Amadou's testimony first that he lost his identity papers in Senegal, but later that he lost all his property and possessions during the arrest; and, finally, Amadou's alleged brief and dispassionate narration of his persecution.

The record indicates that the interpreter's faulty translation likely played a significant part in the judge's credibility determination. Amadou has submitted an affidavit explaining that the judge's first question was originally translated as "[w]hat country did you come to the United States from?" to which he responded "Senegal." J.A. at 13.  He asserts that it was not until the interpreter repeated and re-explained the question that Amadou stated that his country of citizenship is Mauritania.  Amadou additionally argues that contrary to the judge's conclusion, it was the interpreter, not he, who was unfamiliar with the ethnic groups of Mauritania and the terminology associated with those groups.  The tapes of the hearing reveal that Amadou had difficulty understanding the interpretation of the judge's questions regarding the ethnic groups, and that Amadou's answers, which the judge found to be evidence of Amadou's lack of familiarity with the ethnic groups and terminology, were actually "indiscernible" according to the transcript.  Those tapes also indicate untranslated exchanges between Amadou and the interpreter.

lived.  The inspector again questioned Gonzales through the interpreter, and she allegedly acknowledged that she was a prostitute and had been practicing for ten months in Pontiac, Michigan.   At a hearing on the ensuing warrant, which charged Gonzales with various prostitution offenses, the government offered the services of the same interpreter. Gonzales complained that she could not understand the interpreter, and two successive interpreters were substituted. At this hearing Gonzales denied most of the damaging responses she allegedly gave to the first interpreter and stated that she did not understand the questions of that interpreter upon the original examination.

The *Gonzales* Court observed that "[t]he function of an interpreter is an important one . . . affect[ing] a constitutional right."   *Id*. at 937.  We further mandated that "where the services of an interpreter are needed, his capability should be unquestioned" and noted that the inspector's recognition that Gonzales had difficulty understanding the interpreters supports a finding that Gonzales did not receive a fair hearing. *See id*.

In this case, both the immigration judge and the Board were on notice that there was a problem with the interpreter.  For instance,  when Amadou was asked why he left Mauritania, the interpreter stated that Amadou answered "in search of leaving."  J.A. at 53.  When Amadou was asked what had happened to his family in 1989, the interpreter stated something  "indiscernible"  and  then  responded,  "The interpreter doesn't understand" and "The interpreter is having some problems here with some semantics."  J.A. at 53.  A short while later, the interpreter repeated that he was "having some problems here."  J.A. at 54.  Upon cross examination, the judge instructed the interpreter to "[j]ust translate what he said even if it doesn't make sense."  J.A. at 60.  Later, the interpreter again admitted that "[w]e're having problems here with the – with the vocabulary here." J.A at 64.  And finally, when witness Hamadi was questioned, the judge repeated that the interpreter should "[j]ust translate what he said even if it doesn't make sense."  J.A. at 70.

interpreter, who was from Sierra Leone, spoke a different dialect of Fulani than Amadou.  On several occasions during the hearing the interpreter commented that he did not understand what Amadou had said.

Counsel first asked:  "Of what country are you a citizen?" to which Amadou responded "Senegal."  The question was repeated and reexplained by the interpreter, at which point Amadou indicated that he was a citizen of Mauritania. Amadou then testified that while in Mauritania on May 20, 1989, he and his family were arrested in their native village of Bagodine by government officials or armed police because they are black.  They were beaten and shoved into large trucks and transported to open-air concentration camps in M'Bagne. They were held there for fifteen days and then released and expelled from the country.  Amadou first claimed he fled to Senegal and lost his identity papers while in transit, but shortly thereafter stated that he lost his papers while Mauritanian officials were loading him onto the truck. Amadou further testified that he resided in Haraforte, Senegal for four years working with farmers.  He then moved to Dakar, Senegal and remained there one year before coming to the United States.  When asked why he left Senegal, Amadou testified, "I didn't like it there."  J.A. at 59.  Amadou saved his money and bought a plane ticket to the United States, using a friend's passport to enter and mailing the passport back to the owner.  He testified that he had no political ambitions in the United States, Senegal or Mauritania. Amadou's parents still live in the village in Haraforte, which according to him is not a refugee camp.  He has had no contact with his parents since his departure from Senegal.

A second witness, Bocoum Hamadi, testified at the hearing that he studied Arabic with Amadou for three years in Mauritania. Hamadi is from Symari, Mauritania, and testified that he met Amadou when he was nineteen.  Hamadi could not recall the dates of their Arab tutoring.  He also testified that he knew Amadou's mother, father, and brother  in Bagodine.  Hamadi last saw Amadou in Mauritania in 1987.

Based on the testimony, the immigration judge denied Amadou's application for asylum, concluding that Amadou did not meet the evidentiary burdens of proof and persuasion required for a grant of asylum or withholding of deportation. The judge deemed Amadou not credible, citing several inconsistencies in the testimony. After concluding that Amadou failed to show a level of mistreatment that could be characterized as past persecution or that he would face future persecution if he returned to Mauritania, the judge denied Amadou's asylum application. According to the judge, Amadou's sincerity was doubtful because he demonstrated a limited knowledge and lack of familiarity with the ethnic groups of Mauritania and a readiness to use fraudulent documentation to gain entrance to this country. After determining that Amadou failed to show the clear probability of persecution necessary for a grant of asylum, the judge also denied Amadou's application for withholding of deportation.

Finally, the judge rejected Amadou's application for voluntary departure, instead ordering that he be deported to Senegal. The judge labeled Amadou's conduct "reprehensible,"J.A. at 32, finding that he "had provided false testimony within the parameters of §101(f)(6)" and that Amadou "put together a saga in an attempt to obtain a benefit from the Government from the United States." J.A. at 31.

Amadou appealed the judge's ruling to the Board of Immigration Appeals. The Board, after deferring to the judge's adverse credibility findings, affirmed the decision. The Board was not persuaded by Amadou's assertion that he provided credible testimony at his asylum hearing and that he was prejudiced by the incompetence of the interpreter. The Board also found that Amadou failed to meet his burden of proof to establish his asylum claim because the Mauritanian birth certificate he offered was not properly translated or authenticated. Finally, the Board affirmed the judge's exercise of discretion in denying Amadou's application for voluntary departure, noting that there is no indication in the record that Amadou had the appropriate funds or that he would leave the United States if given the opportunity. The

Board subsequently dismissed Amadou's appeal. Having exhausted all administrative remedies, Amadou timely filed a Notice of Appeal requesting this Court's review of the Board's decision.

## II.

Amadou argues on appeal that his due process right to a full and fair hearing was violated because the interpreter was incompetent. According to Amadou, the interpreter's difficulty translating the questions and answers prejudiced him by causing the immigration judge and Board to find that he was not credible. We review de novo the Board of Immigration Appeals's legal determinations. *See Hamama v. INS*, 78 F.3d 233, 235 (6th Cir. 1996).

We find that Amadou was deprived of his due process right to a full and fair hearing because of the incompetence of the interpreter. *See Perez-Lastor v. INS*, 208 F.3d 773, 777 (9th Cir. 2000)(alien's deportation proceedings found to violate due process right to "full and fair hearing" because an incompetent translation prevented him from presenting relevant evidence and caused the Board to find that his testimony was not credible); *see also Augustin v. Sava*, 735 F.2d 32 (2d. Cir. 1984). In *Gonzales v. Zurbrick*, 45 F.2d 934 (6th Cir. 1930), we held that an alien was not accorded a full and fair opportunity to be heard where, notwithstanding successive substitutions of interpreters because of the alien's failure to understand them, the alien was ordered deported on consideration of the whole record. In that case, a Mexican woman who had lawfully entered the United States with her husband was arrested along with an American female friend in connection with a liquor raid. Gonzales's husband had abandoned her two years prior to the arrest. While unrepresented by counsel, Gonzales was asked questions by the police via an interpreter. Gonzales twice denied that she was a prostitute, but her American friend, Hazel Thornton, testified in English, that she (Thornton) was a prostitute and had been for two years, and that she had been previously been arrested for prostitution at a house at which Gonzales also