NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0861n.06
Filed: December 18, 2007

No. 06-4399

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PAULIN ALIAJ and VJOLLCA ALIAJ, | ) | |
| | ) | |
| Petitioners-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MICHAEL B. MUKASEY, Attorney | ) | |
| General of the United States, | ) | |
| | ) | OPINION |
| Respondent-Appellee. | ) | |
| | ) | |

**Before: GUY, MOORE, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge**. Paulin and Vjollca Aliaj, a married couple who are both citizens of Albania, were granted voluntary departure for a period of 90 days after withdrawing their applications for asylum. Claiming that they had received ineffective representation from their privately retained counsel during the removal hearing, the Aliajs then filed a timely motion to reopen the administrative proceedings. The immigration judge (IJ) denied the motion.

After several procedural issues were resolved, the Board of Immigration Appeals (BIA) affirmed the denial of the motion to reopen and dismissed the Aliajs' appeal. The Aliajs now claim that the ineffective assistance of their counsel was so prejudicial that they were denied their Fifth

Amendment right to the due process of law. For the reasons set forth below, we **AFFIRM** the judgment of the BIA.

## I. BACKGROUND

### A. Factual background

The Aliajs separately and illegally entered the United States using fake passports. Paulin first submitted an application for asylum in July of 2001. The application showed that he had entered the United States in May of 1997, but there is no evidence in the record to support such an entry date. Attached to this application was a lengthy declaration detailing alleged beatings, detentions, arrests, and threats suffered by Paulin at the hands of the former Communist regime. Paulin was interviewed by asylum officers in February of 2002, at which point he contradicted a number of the statements contained in his original asylum application, including where and when he had entered the United States. During that interview, Paulin discussed a meeting that he had had with the attorney who had filed his application for asylum. He disclosed to the officers that he had originally signed a blank application, and that he had subsequently demanded that the attorney withdraw that application because "[n]othing other than my name was true."

In June of 2002, Paulin submitted a second application for asylum. That application, which was prepared with the assistance of a different attorney, states that he had entered the United States in September of 2000. He claimed that he had been threatened by a group of men whose leader was the former regional police chief, a person who had been relieved of his duties when the Communist regime fell from power. Paulin asserted that the men had repeatedly threatened and beaten him after he informed the authorities that he had heard the group discussing the smuggling of oil and weapons

into Yugoslavia. He claimed that because many members of this group were later arrested, their colleagues would seek retribution against Paulin if he were to return to Albania. In his second application for asylum, Paulin supplied specific information about his departure from Albania and entry into the United States. The details that he provided in this application contradicted those he had given in his February 2002 asylum interview.

Paulin's wife Vjollca entered the United States in May of 1997. She originally claimed derivative status on her husband's application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT). Eventually, however, she submitted her own application. In that application, Vjollca claimed that "[her] family has been one of the most persecuted families in Northern Albania," and that she feared that she would be "beaten, and imprisoned or even killed for [her] political activities" if she were to return to Albania. She reported that because of her activities with the Youth Forum of the Democratic Party, she had twice been beaten by members of the Socialist Party while recruiting people for the Youth Forum. Vjollca also asserted that these people had threatened to rape and kill her, and harm her entire family, if she continued to work for the Democratic Party. According to Vjollca and a corroborating letter from a doctor in Albania, she received medical attention after both of the attacks. The doctor's letter states that Vjollca was twice treated for a "hemorrhage of the nose and teeth . . . , black marks on the face and different parts of the body, and hematoma."

**B.      Procedural background**

In June of 2002, the Aliajs were served with a Notice to Appear (NTA) and placed in removal proceedings pursuant to the Immigration and Nationality Act § 212(a)(6)(A)(i). The couple appeared

before an IJ in August of 2002. During this hearing, the Aliajs, through new counsel, admitted the allegations contained in the NTA. The Aliajs were provided with an interpreter fluent in their native language at this hearing and at all future merits hearings. In August of 2004, they appeared for a merits hearing on their application for asylum. The IJ and the Aliajs' attorney at the time agreed that because of the falsity of Paulin's original application, he had not submitted a valid request for asylum within a year of entry and would therefore be limited to an application for withholding of removal. Furthermore, because Vjollca could no longer obtain derivative status from Paulin's application, the IJ requested Vjollca to file one of her own. The hearing was then continued. Vjollca subsequently filed a separate application in October of 2004.

In December of 2004, the Aliajs appeared before a different IJ at a merits hearing on their applications. Dalia Kejbou, an attorney retained by the Aliajs two weeks prior to the hearing, represented the couple. At the beginning of the hearing, the IJ concluded that, based on the Aliajs' previous testimony and applications, they were removable as charged. The IJ then heard testimony from the Aliajs, discussed the discrepancies in Paulin's applications, and requested original documents from Kejbou. At that point, Kejbou noted that she had not seen Paulin's original asylum application prior to the hearing and explained that she had left certain documents at home. She was unaware, moreover, that originals of the Aliajs' documents had not been submitted as evidence. Finally, Kejbou did not bring to the hearing a letter from Vjollca's physician that had arrived several days before the proceeding, which letter corroborated Vjollca's claim that she had continuing psychological problems as a result of the alleged mistreatment she suffered in Albania.

At the end of the hearing, after the IJ indicated that the Aliajs' applications were likely to be denied and after they had had an off-the-record discussion with Kejbou, the Aliajs withdrew their applications for asylum and agreed to a voluntary departure within 90 days. The IJ then granted them a voluntary departure and denied the applications for asylum. She also commented that the main problem with both cases was Paulin's filing of a fraudulent application, which she believed tainted their cases "all the way along."

The Aliajs, represented by yet another attorney, subsequently filed a timely petition to reopen the administrative proceedings. They claimed that Kejbou had provided ineffective assistance of counsel at their December 2004 hearing and had "severely prejudiced [them] and completely deprived them of the ability to seek any relief from removal." The IJ denied the motion to reopen, explaining that the Aliajs had "demonstrated a serious lack of credibility in their past dealings with the United States government."

Both petitioners timely appealed that decision to the BIA and proffered their own unofficial transcript of the proceedings below. After briefing had commenced, but before the BIA had made a decision, Paulin was taken into custody by immigration authorities. The Aliajs, in turn, filed a motion for an emergency stay of deportation, which the BIA granted. In March of 2006, the BIA remanded the case so that an official transcript, which is usually not prepared in an appeal from an IJ's decision to grant or deny a motion, could be transcribed and certified. The IJ subsequently certified the transcribed record to the BIA.

In October of 2006, the BIA affirmed the IJ's denial of the motion to reopen and dismissed the Aliajs' appeal. The BIA recognized that the IJ had relied too heavily on Paulin's disavowed

application in declining to reopen the proceedings. It also concluded that "the [Aliajs] did receive inadequate legal representation" during their December 2004 hearing, which, according to the BIA, "helped to deprive them of an opportunity to present their claim." Nevertheless, the BIA determined that the Aliajs had not been denied due process because their asylum claims lacked merit. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

We review questions of law, such as claims of ineffective assistance of counsel, de novo. *Allabani v. Gonzales*, 402 F.3d 668, 676 (6th Cir. 2005). By contrast, we review the BIA's decision to grant or deny a motion to reopen under the abuse-of-discretion standard. *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006).

### B. Ineffective assistance of counsel in immigration proceedings

The Aliajs argue that the ineffective assistance of Kejbou, their counsel during the December 2004 merits hearing, so infected the proceedings that it prevented them from fairly presenting their claims. They assert, moreover, that because the BIA agreed that their privately retained counsel was ineffective, its failure to grant them a new hearing violated their right to the due process of law.

#### 1. *Constitutional basis for a due process claim based on ineffective assistance of counsel*

The Aliajs acknowledge that aliens in civil immigration proceedings do not have a Sixth Amendment right to the effective assistance of counsel. *See Mustata v. Dep't of Justice*, 179 F.3d 1017, 1022 n.6 (6th Cir. 1999) ("[I]t is clear that the Sixth Amendment does not apply to civil

deportation proceedings."). Rather, they claim that the ineffective assistance of Kejbou prevented them from receiving a full and fair hearing. They therefore argue that their due process rights under the Fifth Amendment were violated.

This court has held that an alien bringing a motion to reopen based on a claim of ineffective assistance of counsel must first meet the requirements set forth in *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988). *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006). *Matter of Lozada* requires "(1) that the motion be supported by an affidavit detailing counsel's failings, (2) that counsel be informed of the allegations, and (3) that the motion show that disciplinary charges have been filed with the appropriate authority." *Sako*, 434 F.3d at 863 (citing *Matter of Lozada*, 19 I. & N. Dec. at 639). The government concedes that the Aliajs have met these requirements.

In addition to meeting the *Matter of Lozada* procedural demands, however, an alien raising a due process claim based on ineffective assistance of counsel "carries the burden of establishing that [his counsel's ineffective assistance] prejudiced him or denied him fundamental fairness." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). "Ineffective assistance of counsel in a deportation proceeding will rise to the level of a due-process violation under the Fifth Amendment only if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003) (quotation marks omitted).

To establish a due process violation based on ineffective assistance, therefore, the alien must show that "but for the ineffective assistance of counsel, he would have been entitled to continue residing in the United States." *Sako*, 434 F.3d at 864. Thus, "the key to due process analysis in these

cases is the effect on the outcome of the underlying claim." *Id.* at 865. We therefore turn to a review of the Aliajs' claim for relief to determine whether their ineffective-assistance claim has merit.

### 2. Merits of the Aliajs' asylum claim

Applicants seeking asylum must first meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42)(A). An applicant for asylum "bears the burden of establishing that he or she qualifies as a refugee 'either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.'" *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting 8 C.F.R. § 208.13(b)). Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (quoting 8 C.F.R. § 208.13(b)(1)). This presumption can be rebutted by the government "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return." *Id.* (citation and quotation marks omitted).

The applicant, however, can show a well-founded fear of future persecution even in the absence of past victimization. 8 C.F.R. § 208.13(b)(2)(i). Either way, this "well-founded fear must be both subjectively genuine and objectively reasonable." *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004). "[A]n alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)).

The BIA determined that neither of the Aliajs could establish either past persecution or a well-founded fear of future persecution. In particular, it concluded that although the Aliajs had been mistreated, "the harm they have suffered simply would not rise to the level of past persecution." The BIA noted that, even accepting all of the Aliajs claims as true, there was no evidence that either individual had ever been "detained, imprisoned, tortured, or sexually assaulted." In reaching this conclusion, the BIA relied in part on this court's decision in *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006), where the court held that being mistreated at a political demonstration is insufficient to establish past persecution. As the court explained:

> Even assuming, as the IJ did, that this attack indeed took place, it does not amount to persecution. Courts have ruled that persecution can be found on the basis of only one incident, but an isolated attack must be of sufficient severity to warrant such a finding. In this case, Lumaj claims to have been beaten and to have suffered some bodily injuries, but she was not detained, imprisoned, tortured, or sexually assaulted in any way. Persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.

*Id.* (brackets, citations, and quotation marks omitted).

The BIA also noted that Paulin had failed to provide any evidence that he "was . . . targeted for any reason other than as retribution, intimidation, or punishment" for reporting smuggling activity to the police. In other words, Paulin did not show that "his past mistreatment was on account of a protected ground." *See* 8 U.S.C. § 1101(a)(42)(A) (requiring "persecution or a well-founded fear of persecution *on account of race, religion, nationality, membership in a particular social group, or political opinion*" (emphasis added)).

Although there appears to be substantial evidence to support the BIA's conclusion on the issue of past persecution, we have no need to resolve the issue because the Aliajs are in any event unable to show an objectively reasonable fear of *future* persecution. According to the Aliajs, their well-founded fear of future persecution is based on their family history of opposing Communism and their current membership in the Democratic Party. The BIA, however, noted that "Albania's human rights record has steadily improved since 1998." Indeed, the BIA cited both current Department of State reports and this court's own precedents to support its determination that "there is virtually no evidence that individuals are targeted for mistreatment on political grounds." (Quoting *Lumaj*, 462 F.3d at 578)) This court has likewise repeatedly concluded that the conditions in Albania have improved to such an extent that there is no objective basis for a well-founded fear of political persecution upon returning there. *See, e.g.*, *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006); *Macotaj v. Gonzales*, 424 F.3d 464, 465 (6th Cir. 2005); *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).

The Aliajs are therefore ineligible for asylum under 8 U.S.C. § 1101(a)(42)(A). And because they cannot show that they are "entitled to continue residing in the United States," *Sako*, 434 F.3d at 864, the Aliajs are unable to demonstate the prejudice required to mount a successful due process challenge based on the ineffective assistance of their counsel. *See id.* Moreover, given that the Aliajs failed to show prejudice, we need not evaluate whether Kejbou's allegedly deficient performance actually rose to the level of constitutional ineffectiveness. *See Huicochea-Gomez*, 237 F.3d at 700.

The Aliajs also assert that the BIA erred by failing to fully consider their claims for withholding of removal and protection under the CAT. But the BIA properly concluded that, because the Aliajs could not meet the standard for asylum eligibility, they necessarily could not meet the more stringent standards for the latter two forms of relief. This court has reached the same conclusion in other cases. *See, e.g.*, *Liti v. Gonzales*, 411 F.3d 631, 640-41 (6th Cir. 2005) (noting that because the petitioners in that case could not meet the requirements for asylum, they also failed to meet the heightened standards for withholding of removal and CAT protection). The Aliajs' contention that the BIA erred in failing to fully consider these latter claims therefore lacks merit.

## C.     Other due process considerations

Most of the Aliajs' attention is on their ineffective-assistance-of-counsel claim. Embedded in that discussion, however, are a few arguments that further attack the fairness of their proceedings. In this regard, the Aliajs contend that they were denied a full and fair hearing because (1) the IJ erred by focusing too much on Paulin's fraudulent application, (2) the IJ was not a neutral arbiter in their case, (3) there were fundamental errors in translation that prejudiced them, and (4) the finding that they were removable was erroneous because the former Immigration and Naturalization Service (now the Department of Homeland Security) never filed amended NTAs. These remaining arguments are only obliquely mentioned and are lacking in merit, but we will address them briefly.

The Aliajs' claim that the IJ focused too much on Paulin's fraudulent asylum application overlooks the decision of the BIA in this case, which specifically agreed that the IJ had in fact relied too heavily on the disavowed application. Indeed, it was for this very reason that the BIA assumed the truth of everything that the Aliajs had alleged. The Aliajs respond to being given the benefit of

the doubt by contending that the BIA engaged in inappropriate factfinding. But this argument is totally unpersuasive where all of the "factfinding" was in the Aliajs' favor. In any event, the BIA rejected the IJ's heavy reliance on Paulin's first application for asylum. The Aliajs' contention that they did not receive a full and fair hearing for this reason thus has no merit.

Their claim about the bias of the IJ also fails. Other than the IJ's generally sarcastic demeanor and unfavorable ruling, there is nothing in the record to show that the IJ was not a neutral arbiter. *Cf. Hassan v. Gonzales*, 403 F.3d 429, 436-37 (6th Cir. 2005) (concluding that an IJ's "brusque" and "sarcastic" comments did not violate Hassan's due process rights because the comments did not reveal bias or prevent Hassan from presenting his case).

As for the Aliajs' claim regarding the errors in translation, an examination of the record shows that any discrepancies between the unofficial transcript provided by the Aliajs and the certified record were unrelated to the substance of their testimony. Their reliance on *Amadou v. INS*, 226 F.3d 724, 726-28 (6th Cir. 2000), is therefore misplaced. The Aliajs, in contrast to Amadou, do not claim that the translator was incompetent. All of the questionable translations that they point to, moreover, had no bearing on the ultimate decision to deny them relief. Indeed, the only "mistranslation" alleged by the Aliajs that could possibly have had any impact on the fairness of their hearing had to do with the IJ's explanation of voluntary departure. But both the unofficial transcript and the certified transcript demonstrate that the IJ clearly explained what voluntary departure entailed and questioned the Aliajs to ensure that they understood what they were agreeing to.

Finally, the Aliajs' argument that the IJ relied on incorrect factual allegations in the NTAs ignores the fact that they have conceded that they entered the United States illegally. The record,

moreover, demonstrates that the IJ relied on the Aliajs' testimony and asylum applications, not the NTAs, in making her decision. For this reason, any problems with the NTAs provide no basis to attack the underlying charge of removability.

**D.     Motion to reopen**

The Aliajs also claim that the BIA abused its discretion in refusing to reopen the administrative proceedings. They argue that, because the BIA determined that they had been provided with ineffective assistance at their December 2004 merits hearing, the BIA erred by refusing to grant their motion. But because their due process claim fails, this claim is likewise without merit.

We review the denial of a motion to reopen, regardless of the underlying basis of such a motion, under the abuse-of-discretion standard. *INS v. Doherty*, 502 U.S. 314, 323-24 (1992). The Attorney General has broad discretion to grant or deny such motions. *See id.*; 8 C.F.R. § 1003.23(b)(3) (providing that discretion to deny a motion to reopen exists even if "the moving party has established a prima facie case for relief"). To show an abuse of discretion, the Aliajs must therefore demonstrate that the BIA's decision offered no "rational explanation, inexplicably depart[ed] from established policies, or rest[ed] on an impermissible basis such as invidious discrimination against a particular race or group." *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003) (quotation marks omitted).

The Aliajs have failed to meet this standard. Although they challenged the IJ's rulings on the basis of the discrepancies between the certified transcript and the unofficial transcript, they did not present the BIA with any new evidence that was not previously available. *See* 8 C.F.R.

§ 1003.2(c)(1) ("A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ."); *Sako v. Gonzales*, 434 F.3d 857, 865 (6th Cir. 2006) (affirming the denial of a motion to reopen in part because the petitioner had not offered any new or previously unavailable evidence).

The BIA, moreover, effectively circumvented any alleged discrepancies between the transcripts by assuming the truth of the facts that the Aliajs asserted. It correctly identified the legal standard for due process claims based on ineffective assistance of counsel and applied that standard to the Aliajs' case. Concluding that the Aliajs were not able to show prejudice because their asylum claim failed, the BIA gave a detailed explanation for the decision that it reached. Under these circumstances, the Aliajs simply cannot show that the BIA exercised its discretion in a manner that was "arbitrary, irrational or contrary to law." *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004). The Aliajs' claim that the BIA erred in refusing to grant their motion to reopen therefore fails.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the decision of the BIA.