NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0495n.06

Case No. 18-3095

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 04, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MAHAMADOU ALHOUSSEINI, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| JEFFERSON B. SESSIONS, III, Attorney | ) | APPEALS |
| General, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE: BATCHELDER, DONALD, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Sometimes things get lost in translation. At least that is what Mahamadou Alhousseini claims happened at his asylum hearing. He says that when the interpreter said he was a member of a rebel group, the interpreter misunderstood him. And when he detailed the machine guns and the rocket launchers that he helped purchase—that, too, was just a misunderstanding. As such, he petitions for relief from the Board of Immigration Appeals order mandating his removal from the country. But because the evidence suggests the interpreter correctly represented what Alhousseini said, we deny his petition.

I.

Mahamadou Alhousseini is a native of Niger. After overstaying his tourist visa, he applied for asylum. He said the Niger government police "arrested, beat[], molested, [and] tortured" him because of his Touareg ethnicity.

After Alhousseini submitted his application, an asylum officer interviewed him. Alhousseini did not speak English, and he could not find a Touareg interpreter. So he hired a French interpreter for the interview instead. During the interview, Alhousseini said that the police came after him because he served as a member of the Air and Azaouak Liberation Front (FLAA). The FLAA was a Touareg rebel group that fought the government of Niger in the early 1990s, killing both government soldiers and civilians. He stated that he was elected as Information Secretary, and he toured the countryside raising money. The money was put toward weapons and gear—"Kalashnikovs [machine guns], rocket launchers, jeeps, [and] 4x4s." After the leader of the rebellion (who later became a government minister) fell out of favor with the government, Alhousseini was arrested. Since the FLAA was considered an undesignated terror group, the asylum officer concluded he was likely ineligible for asylum because he assisted with persecution and engaged in terrorist activity. But, for reasons unclear in the record, the government did not act on Alhousseini's asylum application for four years.

The Department of Homeland Security eventually commenced removal proceedings against Alhousseini. In response, Alhousseini withdrew his asylum application and applied for a change in status to lawful permanent resident. Over the course of his hearing before the Immigration Judge (spread out over two sessions), Alhousseini told a different story about his time in Niger. This time, he said that he was *not* a member of the FLAA and that his interpreter must have misunderstood him before. In fact, Alhousseini says he was part of a different group,

Jeunesse Touareg. This group provides school materials and educational assistance to Touareg communities in Niger—a stark contrast from the FLAA's terrorist activities.

But the asylum officer who heard Alhousseini's earlier asylum case with the interpreter disputed this new story. She testified that she remembered Alhousseini's interview, and there was no evidence that Alhousseini and his interpreter had any misunderstandings. Since Alhousseini's statements (through the interpreter) raised potential national security issues, she recorded each question and answer and had Alhousseini review them before leaving. Alhousseini made no contemporaneous objections to the interpreter or the interpreter's translations.

The Immigration Judge denied Alhousseini's status adjustment application and ordered removal. He concluded that Alhousseini was not credible because of the major discrepancies between his asylum hearing, where he said he was a member of the FLAA, and his adjustment hearing, where he told a completely different story. The Immigration Judge also found that Alhousseini failed to demonstrate that he was not inadmissible, as required to adjust his status to lawful permanent resident. 8 U.S.C. § 1229a(c)(4)(A); 8 C.F.R. § 1240.8(d).

The Board of Immigration Appeals affirmed. Alhousseini now petitions for review.

II.

Alhousseini makes two due process claims, which we review de novo. *Suarez-Diaz v. Holder*, 771 F.3d 935, 942 (6th Cir. 2014).

*Incompetent Interpreter*. First, Alhousseini argues that his interpreter was incompetent and misrepresented the statements he made in his asylum hearing. The courts have held that noncitizens like Alhousseini have certain due process rights, including the right to a competent interpreter. *See Amadou v. INS*, 226 F.3d 724, 726 (6th Cir. 2000); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) (affirming that the due process clause applies to noncitizens). But Alhousseini

needs to do more than just claim his interpreter was incompetent. He must demonstrate it from the record. *See Amadou*, 226 F.3d at 727.

Nothing in the record suggests Alhousseini and his interpreter had trouble understanding each other. Alhousseini never complained that he could not understand his interpreter. *See Gonzales v. Zurbrick,* 45 F.2d 934, 935 (6th Cir. 1930) (noting that during her hearing "[t]he alien complained that she could not understand [the interpreter]"). Nor did his interpreter suggest that she could not understand Alhousseini. *See Amadou*, 226 F.3d at 727; *see also Gishta v. Gonzales*, 404 F.3d 972, 978 (6th Cir. 2005). Such problems would have bolstered Alhousseini's claim. For example, in *Amadou*, the hearing transcript showed that the interpreter stated that he was "having some problems" multiple times. *Amadou,* 226 F.3d at 727. He said he did not understand the witness and had difficulty "with the vocabulary." *Id.* Yet no such interpretation issues were discussed during Alhousseini's hearing.

The asylum officer was also on the look-out for such interpretation issues. The asylum officer testified that she received specialized training to spot interpretation problems, and she would often stop interviews to make sure both the interpreter and the asylum applicant understood each other. If the problems continued, then she would reschedule the interview and arrange for a different interpreter. The asylum officer's awareness stands in stark contrast to the Immigration Judge's behavior in *Amadou*. In that case, the Immigration Judge seemingly ignored the interpretation errors, telling the interpreter to "[j]ust translate what he said even if it doesn't make sense." *Id.* (alteration in original). Here, the asylum officer did not ignore translation issues but was explicitly looking out for them—and she did not see any.

Yet sometimes circumstantial evidence demonstrates interpretation issues. For instance, courts will look and see if a person's interpreted answers are responsive to the questions asked, if there are grammatical issues, or if there appears to be general confusion during the proceedings. *See, e.g.*, *Ilunga v. Holder*, 777 F.3d 199, 208–09 (4th Cir. 2015). But in Alhousseini's case, the circumstantial evidence points the other way. While Alhousseini suggests he spoke a different dialect of French than the interpreter, he has not pointed to any material differences in the language that would lead to incorrect or unresponsive answers. Indeed, Alhousseini's issue is not that his answers were unresponsive, but rather *too responsive*. At his asylum hearing, Alhousseini extensively detailed his activities with the FLAA. He talked about raising approximately seventy-million West African CFA francs, over $100,000 U.S. dollars at then-current exchange rates. He discussed how the money was used to buy machine guns, rocket launchers, jeeps and 4x4's—all for use against the government of Niger. And he mentioned his election to a FLAA leadership position as Information Secretary.

Alhousseini now attempts to explain away these statements. He says he meant to preface each one with "I was accused of [raising money]" or "I was accused of [buying weapons for armed rebellion]." But his detailed answers belie such an after-the-fact explanation. Moreover, Alhousseini was read back *each* of these statements in French (the language he chose to conduct the interview in) before he left the asylum hearing. We are hard pressed to see how he would miss that "j'ai été accusé . . ." was never read throughout his fifteen pages of statements. And to the extent he contends that he meant to say he was actually in the Jeunesse Touareg, he does not explain why there is no discussion of that group or its activities—education, schoolbooks, supporting children—in his interview. Nor does Alhousseini point to anywhere in the asylum

hearing where he *meant* to refer to Jeunesse Touareg. It is easy to see why—machine guns and math books are not too similar.

*Delay.* Second, Alhousseini claims that the four-year delay between his asylum hearing and the referral of his case to an Immigration Judge deprived him of due process. Even assuming the delay was unreasonable, Alhousseini cannot show that the delay prejudiced him. *See Garza-Moreno v. Gonzales*, 489 F.3d 239, 241–42 (6th Cir. 2007). In fact, he fails to point to even a single reason why the later referral prevented him from addressing supposed interpretation errors or otherwise hindered his case. While he seems to suggest that the delay calls into question the reliability of the handwritten notes made by the asylum officer of his hearing, such notes are routinely used in immigration hearings. *See, e.g.*, *Sinani v. Holder*, 418 F. App'x 475, 480 (6th Cir. 2011). And, in any event, he has not attempted to show why the asylum officer's notes are unreliable. As such, Alhousseini has not demonstrated that the delay violated his due process rights.

### III.

In addition to his due process claims, Alhousseini challenges the substantive findings of the Board. Specifically, he contends the Board erred by (1) making an adverse credibility determination against him, and (2) finding him inadmissible. As an appellate court, we must defer to the Board if their findings are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). We take each of Alhousseini's arguments in turn.

*Adverse Credibility*. Alhousseini argues that the record contradicts the Board's adverse credibility finding. He claims that the interpreter's misunderstandings of his statements, when paired with the documentary evidence, demonstrate that the Board should have found him credible.

But "it takes more [than plausibility] to overcome an adverse credibility determination." *Shkabari v. Gonzales*, 427 F.3d 324, 330 (6th Cir. 2005). As discussed, there is no evidence that the interpreter misunderstood Alhousseini at his asylum hearing. And the documentary evidence that Alhousseini points to does not support his credibility but serves to undermine it. For instance, Alhousseini uses a certificate to show he was actually in Jeunesse Touareg and not the FLAA. But the Jeunesse Touareg certificate says the organization was founded in 2003—almost a decade after Alhousseini testified that he joined and fundraised for them. The FLAA, on the other hand, existed when Alhousseini fundraised. So Alhousseini's favored certificate evidence, when paired with his own testimony, points to two stories: either (1) Alhousseini fundraised across the countryside to buy school supplies for a group that did not yet exist *or* (2) Alhousseini fundraised to buy rocket launchers for a group *that did*. Faced with completely divergent stories and documentary evidence that does not support Alhousseini's alternative story, we are not in a position to reverse the Board's credibility determination. After all, the Immigration Judge actually heard Alhousseini and judged for himself the merits of his stories. *Cf. Juan-Pedro v. Sessions*, No. 17-3949, 2018 WL 3202953, at *6–7 (6th Cir. June 28, 2018) (Thapar, J., dissenting).

*Inadmissibility*. In order to adjust his status to lawful permanent resident, Alhousseini needed to show that he was not inadmissible. 8 U.S.C. § 1229a(c)(4)(A); 8 C.F.R. § 1240.8(d). The Board found Alhousseini was inadmissible for two separate reasons. Alhousseini failed to disprove either one. First, he failed to show that he did not make willful misrepresentations of material fact in his asylum interview. 8 U.S.C. § 1182(a)(6)(C)(i). Second, he failed to show he was not a member of a terrorist group. *Id*. § 1182(a)(3)(B)(i)(VI). Alhousseini suggests that this was error because the two findings are contradictory. But Alhousseini did not make this argument below and thus has failed to exhaust it. So we lack jurisdiction to consider it now. *See Gaye v.*

*Lynch*, 788 F.3d 519, 527–28 (6th Cir. 2015). Alhousseini's remaining arguments involve assertions about his incompetent interpreter which, as discussed, the record does not support.

\*　　\*　　\*

For these reasons, we deny Alhousseini's petition.