NOT RECOMMENDED FOR PUBLICATION

File Name: 08a0116n.06

Filed: February 25, 2008

No. 06-4445

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHERIF DIALLO, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE BOARD OF |
| v. | ) | IMMIGRATION APPEALS |
| | ) | |
| MICHAEL B. MUKASEY, Attorney | ) | |
| General of the United States, | ) | AMENDED OPINION |
| | ) | |
| Respondent-Appellee. | ) | |

**Before: GUY, MOORE, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Cherif Diallo, a native and citizen of Guinea, applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). She claimed that she had been subjected to female genital mutilation (FGM) as a young child, and that she was arrested, beaten, and raped on account of her political activities as an adult. After a hearing, an immigration judge (IJ) found her fear of future persecution not to be credible and ordered that she be deported. The Board of Immigration Appeals (BIA) summarily affirmed the IJ's decision. For the reasons discussed below, we **AFFIRM** the judgment of the BIA.

**I. BACKGROUND**

-1-

Diallo arrived in the United States from Conakry, Guinea on an international flight in June of 2002. She was then 28 years old. When an immigration inspector at the Washington-Dulles International Airport identified problems with her passport and visa, he began to interview her through a French interpreter because an interpreter who spoke Diallo's native language of Fulani was not available. Diallo, who is fluent in French, said that the interpreter "did not speak French well," so the inspector secured a second French interpreter by phone.

According to Diallo's sworn statement, the inspector began by explaining to Diallo that she appeared to be inadmissible, but that U.S. law provides protection to persons who face persecution or harm upon return to their home country. The inspector also told Diallo that, if she feared returning to Guinea, she could have a separate, confidential interview with another immigration officer regarding her fear. When the inspector asked Diallo if she understood what he had said, she answered, "Yes."

The inspector then proceeded to question Diallo regarding her identity, passport, visa, and reasons for coming to the United States. According to her statement, Diallo told the inspector that she had come to the United States to attend school in Washington, D.C. Her visa, however, did not include the name of a school. She told the inspector that she did not know the name of the school or how long she would stay in the United States because she had not yet contacted the school. Diallo also said that she did not know when she was to start school, only that she was to begin "after [she] checked the different schools." The inspector then asked Diallo about some of the items that she had in her possession, including pills, a secure keycard, and a document in French titled "Materiels Du Labo Boimedical."

At the end of the interview, the inspector asked Diallo, "Do you have any fear or concern about being returned to your home country or being removed from the United States?" Diallo answered, "I am not afraid." A sworn statement was prepared in English on Immigration and Naturalization Services (INS) Form I-867A, as required by 8 C.F.R. § 235.3(b)(2). Diallo initialed each page and signed the document. The inspector did the same, and a witness signed the overall document. Diallo was then returned to Guinea.

Three months later, in September of 2002, Diallo again flew to the United States and this time was admitted, apparently because her new visa specified the school that she planned to attend. She subsequently filed a timely application for asylum, withholding of removal, and protection under the CAT. Diallo claimed asylum based on persecution due to her political activities and because she was forcibly subjected to FGM as a young child.

In her asylum application, Diallo recounted two incidents of political persecution. The first allegedly occurred during municipal elections in June of 2000, when Diallo said that she worked as a polling monitor on behalf of the Union for the New Republic (the UPR), an opposition party that represents her ethnic group. According to Diallo, members of the PUP governing party (its initials are not explained in the record) arrived at the polling station, said that they were going to vote for people who were not present, and began "filling up the boxes with ballots." When Diallo and others allegedly protested, they were arrested, accused of manipulating the votes in favor of the UPR, interrogated, and taken to a police station. Diallo said that she was then beaten and raped by two soldiers. She claims that she was released 13 days later and was forced to sign a document stating that she would not participate in any future demonstrations or political party activities.

The second incident allegedly occurred in November or December of 2001. While protesting conditions at Nasser University, where she was a student, she claims that she was again arrested, beaten, and interrogated by some soldiers. The soldiers allegedly told her that she had been arrested for political reasons and warned her to quit her political activities. She said that she was released on or before December 31, 2001 and was required to report to the police every two weeks thereafter, which she purportedly did.

Diallo's claim for asylum is also based on the fact that she was forced to undergo FGM when she was five or six years old. FGM is defined by the World Health Organization as "all procedures which involve partial or total removal of the external female genitalia or other injury to the female genital organs whether for cultural or any other non-therapeutic reasons." Diallo submitted an affidavit from an INS doctor corroborating her FGM claim. She also claims that she fears that any daughters she might have could also be subjected to FGM, but conceded that she does not presently have any daughters.

Diallo met with an asylum officer in January of 2003 to discuss her application. During the interview, Diallo recounted her claims of political persecution, but did not discuss her FGM claim. The interview was conducted in Diallo's native language of Fulani through an interpreter that Diallo provided. When asked why she left Guinea in September of 2002, she said that she "had a problem with the PUP party" due to her UPR affiliation. Diallo also told the asylum officer that, after she was returned to Guinea in June of 2002 and until she entered the United States in September of 2002, she attended classes at Nasser University and did not encounter any problems because "there were no events that caused trouble."

At the end of the interview, the asylum officer questioned Diallo about her inconsistent statements regarding her fear of returning to Guinea:

Officer: When you gave your statement at the airport on June 21, 2002, you said you were not afraid to return to Guinea, and mentioned nothing about any political activities or persecution you suffered. Why is your story so different now?

Diallo: When I arrived at the airport, they told me that my passport was fake, that my visa did not have the address of my school in Washington, and they did not give me the chance to tell my story. They did not have a Fullah [sic] interpreter, and the woman interpreter did not speak French well. When they got an interpreter by telephone, I could not understand him well.

The asylum officer transcribed the interview by hand and prepared a statement that Diallo signed, attesting that it was read to her in her native language, and that it is a true, complete, and correct statement.

An asylum hearing before an IJ commenced in December of 2004 and continued into March of 2005. Diallo repeated the claims that she had made to the asylum officer in January of 2003. When asked why she tried to enter the United States in June of 2002, Diallo testified that she wanted to continue her studies in the United States and confirmed that this was the reason she had given in her visa application. She also testified that, contrary to the June 2002 airport statement, she had been afraid to return to Guinea and told the IJ that, after being returned to Guinea, she lived in hiding at her uncle's house.

Diallo further testified that her June 2002 statement is inaccurate, that the immigration inspector never asked her if she was afraid to go back to Guinea, and that she was threatened with jail if she did not sign it. She also claimed that she could not read the statement because it was in

English and that, contrary to the requirements of 8 C.F.R. § 235.3, it was not read or explained to her. Finally, Diallo contended that she could not understand the second interpreter. In her asylum application, however, Diallo acknowledged that she speaks French "fluently." She said that the second interpreter's "French was good," but that his accent was "different."

The IJ issued his decision in March of 2005, denying Diallo's application for asylum and withholding of removal, and dismissing her claims under the CAT. He found that she had in fact been subjected to FGM, but concluded that Diallo's claims of political persecution and of fearing a return to Guinea were not credible. Diallo appealed from the IJ's decision to the BIA, which summarily affirmed the IJ's findings. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

Where the BIA summarily adopts the IJ's decision without issuing its own opinion, we review the decision of the IJ as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005). We must affirm the IJ's factual findings, as well as the conclusion that the petitioner failed to establish eligibility for asylum, if substantial evidence supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (upholding the IJ's rulings where "supported by reasonable, substantial, and probative evidence on the record considered as a whole") (citation omitted). Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original). Questions of law involving immigration

proceedings, on the other hand, are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004).

**B.     Asylum**

Adjudicating a request for asylum involves a two-step inquiry: "(1) whether the applicant qualifies as a refugee as defined in [8 U.S.C.] § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citation and quotation marks omitted). With respect to the first issue, the term "refugee" is defined by federal law as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

"The asylum applicant bears the burden of establishing that he or she qualifies as a refugee 'either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.'" *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting 8 C.F.R. § 208.13(b)). Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch*, 146 F.3d at 389 (quoting 8 C.F.R. § 208.13(b)(1)(i)). This presumption can be rebutted by the government "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has

a well-founded fear of being persecuted if he were to return." *Id.* (citation and quotation marks omitted).

The applicant's "well-founded fear must be both subjectively genuine and objectively reasonable." *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004). "[A]n alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994).

### 1. *Adverse credibility determination*

Credibility determinations are findings of fact, and are therefore reviewed under the "substantial evidence" standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). "Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim." *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (brackets, citations, and quotation marks omitted). "Credibility encompasses not just consistency, but also plausibility and sufficient detail." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004). A credibility finding, like other factual findings, will be reversed "only if any reasonable adjudicator would be compelled to conclude to the contrary." *Yu*, 364 F.3d at 703 (quoting 8 U.S.C. § 1252(b)(4)(B)) (quotation marks omitted).

The IJ found that Diallo was not credible because of "abundant" discrepancies in her case. Most damaging to Diallo's credibility is her June 2002 airport statement, in which she explicitly states that her reason for coming to the United States was to go to school, and that she was not afraid of returning to Guinea. The 2002 statement lacks any mention of the persecution that she allegedly

suffered in Guinea and explicitly contradicts her present claim that she fears returning there. Diallo has since disavowed the airport statement and challenges it on the grounds that she could not understand the second interpreter, that the statement does not accurately reflect her answers, and that the statement was not read back to her before she signed it.

Other evidence in the record, however, seriously undermines these claims and her credibility generally. Diallo's own asylum application states that she is "fluent" in French and attended French schools for almost 20 years, including two years of classes at Nasser University that were conducted solely in French. When pressed about why she could not understand the second interpreter at her June 2002 airport interview—who, like Diallo, was a French speaker from West Africa—Diallo said only that his accent was "different." She seemed at other times to accuse the interpreter of lying about the questions and answers, a claim made less plausible by Diallo's own acknowledgment that the interview was being simultaneously transcribed as it took place.

In addition, a second interpreter was located when Diallo said that she could not understand the first interpreter. Despite her current claim that she could not understand the second interpreter either, she did not raise this as an issue at the time. She instead apparently sat through a lengthy interview and then signed a sworn statement memorializing the interview without further protest. Diallo had no reason to believe that the immigration inspector would not have tried to locate still another interpreter if she had requested him to do so.

Moreover, Diallo does not challenge the sworn statement in its entirety. She instead selectively challenges the portions of her statement that hurt her asylum claim the most—i.e., why she came to the United States and that she was not afraid to return to Guinea—and does not

challenge other parts that are consistent with her hearing testimony (e.g., that her uncle, who was allegedly Guinea's ambassador to the United States, helped her get a visa, that she wanted to go to school in the States, and why she had certain items in her possession at the airport).

Diallo also claims that the immigration inspector did not ask her if she was afraid to return to Guinea, that she did not read the statement before signing it, and that the statement was not read or explained to her. The claim that she was not asked about her fear of returning to Guinea is particularly difficult to credit because, as the IJ noted, that was the very purpose of the interview, consistent with the applicable immigration form, which states that the officer will first "explain [the immigrant's] rights, and the purpose and consequences of this process."

Regulations promulgated under § 235(b)(2) of the Immigration and Nationality Act require that the examining immigration officer, here the inspector, "create a record of the facts of the case and statements made by the alien" in the form of a sworn statement using Form I-867A, and "read (or have read to [the alien]) all information contained on Form I-867A." *See* 8 C.F.R. § 235.3(b)(2)(i). If an alien in Diallo's position indicates an intention to apply for asylum or expresses a fear of persecution, the inspector must discontinue removal proceedings and record "sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility." 8 C.F.R. § 235.3(b)(4). There is nothing in the record, other than Diallo's unsubstantiated claims, to indicate that the inspector failed to comply with his legal duties in either conducting her interview or taking her statement.

Apart from the June 2002 airport statement, the IJ also questioned the evidence that Diallo submitted to corroborate her claims of political persecution. The IJ specifically noted that Diallo's most credible witness, her cousin Lena Diallo, testified about Diallo's political activities on the basis of information that came entirely from the petitioner herself. Furthermore, Diallo did not produce corroborating evidence of her political activities that predated her asylum application. She also acknowledged at both her asylum interview and at her hearing that she did not suffer any persecution after she was returned to Guinea in June of 2002. As the IJ noted, this undermines her claims that she will face persecution for her past political activities if she is returned to Guinea. Diallo also provided inconsistent accounts of her activities in Guinea between June and September of 2002. According to the sworn statement from her January 2003 asylum interview, which she does not challenge, she said that she attended classes at Nasser University, where she had allegedly been arrested in 2001 for protesting education conditions. But at her asylum hearing before the IJ in 2005, Diallo told the IJ that she lived in hiding at her uncle's house during that time, and did not mention that she had attended classes at the university.

We conclude that the IJ's adverse credibility determination was based on "specific reasons" that "go to the heart of [her] claim[s]" of political persecution and fear of returning to Guinea. *See Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006). The record thus contains substantial evidence to support the IJ's adverse credibility determination and does not compel a conclusion to the contrary. *See Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004).

Diallo's citation to *INS v. Amadou*, 226 F.3d 724 (6th Cir. 2000), does not warrant a different conclusion. In that case, Amadou appealed a denial of asylum, claiming that his due process right

to a full and fair deportation hearing was violated because the interpreter was incompetent. *Id.* at 726. The transcript of Amadou's hearing showed that the interpreter, who was from Sierra Leone, and Amadou, who was from Mauritania, spoke entirely different dialects of Fulani, and that there were several occasions during the hearing when problems with vocabulary, semantics, and coherence confused the interpreter. *Id.* at 724, 727. Because the interpreter commented repeatedly that he did not understand Amadou, the IJ was on notice that there was a problem. *Id.* at 727. The IJ also instructed the interpreter, at the end of the hearing, to "just translate what [a witness] said even if it doesn't make sense." *Id.* This court found that, because Amadou's application for asylum was denied based on his hearing testimony, the poor translation adversely affected his constitutional right to a fair hearing. *Id.*

Diallo's case, however, is distinguishable from *Amadou* in a number of respects. Unlike Amadou, Diallo does not dispute that she had a full and fair deportation hearing before an IJ. Diallo's hearing, which was conducted in her native language, allowed her the opportunity to explain why she was allegedly unable to understand the second interpreter at the 2002 airport interview. As previously noted, there is nothing to suggest that the interpreter was incompetent or could not understand Diallo, or that either the immigration inspector or the second interpreter was aware that Diallo was having any trouble comprehending the translation.

Diallo's answers at the 2002 airport interview were responsive, detailed, and generally consistent with her hearing testimony, with the notable exceptions of her statements that she was not afraid to go back to Guinea and that she came to the United States to attend school. The specificity of the interview questions and answers also belies Diallo's claim that the translation was not

accurate. In contrast to Amadou, who pointed to several specific problems with the translation, Diallo relied only on the generality that the interpreter's accent was difficult to understand.

### 2.    *Female genital mutilation*

The evidence supports, and the government does not challenge, the IJ's conclusion that Diallo in fact suffered past persecution in the form of FGM. Diallo says she fears that, if returned to Guinea, any daughter that she might have would be subjected to FGM, though she concedes that she does not presently have a daughter. This speculative possibility is too remote to support her current asylum claim. *See Bah v. Gonzales*, 462 F.3d 637 (6th Cir. 2006) (denying asylum to a mother who claimed that she feared her four daughters, who were living in Guinea at the time, would be subjected to FGM if she did not obtain asylum and bring them to the United States, because the daughters were "not here [in the United States] seeking asylum in their own rights based on their [own] fears of FGM and persecution"); *Cf. Abay v. Ashcroft*, 368 F.3d 634, 642 (6th Cir. 2004) (granting asylum to a mother in her own right because she had a well-founded fear that her young daughter would face FGM if returned to Ethopia, where the practice is nearly universal, because the daughter, who sought asylum on her own behalf, was found to have a well-founded fear of undergoing FGM).

Diallo also argues that she is eligible for asylum solely because she herself suffered FGM in the past. As previously discussed, this court has recognized both that FGM is a form of past persecution and that such persecution entitles a petitioner to a rebuttable presumption of a well-founded fear of persecution. But we have never held that a person who has been subjected to FGM is entitled to asylum on that basis alone, since the unique cultural underpinning behind FGM rebuts

the presumption that a female will be subject to future persecution solely because she underwent the procedure as child. *See In re A-T*, 24 I&N Dec. 296, 299 (BIA 2007).

To be sure, the Ninth Circuit in *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005), concluded that FGM constitutes "continuing persecution," analogous to the practice of forced sterilization in China, and on that ground held that women who have undergone FGM are eligible for asylum regardless of whether the presumption of a well-founded fear of future persecution has been rebutted. The soundness of the decision in *Mohammed*, however, is debatable because Congress specifically defined the term "refugee" to include victims of forced sterilization. *See* Immigration and Naturalization Act, 8 U.S.C. § 1101(a)(42). No equivalent "shortcut" to refugee status applies to those subjected to FGM. *See A-T*, 24 I&N Dec. 296 (refusing to apply *Mohammed* and explaining that the BIA precedent on which *Mohammed* relied granted asylum to victims of forced sterilization based on Congress's "manifestly clear intent" to "extend[] asylum to those who have sustained such family planning persecution in the past"); *cf. Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) (explaining that, although a woman who has already undergone FGM may not be able to show that she has a well-founded fear of future FGM, she may nevertheless face other forms of future persecution that make her eligible for asylum). In addition, the court in *Mohammed* alternatively concluded that, even if FGM were not analogous to forced sterilization, the petitioner might well have been at risk of further genital mutilation if returned to Somalia because approximately 80% of Somalian women were subjected to a type of FGM that she had not yet suffered. *Mohammed*, 400 F.3d at 801. There are no analogous factual developments in the case before us.

Moreover, we need not reach this issue in the present case because Diallo did not raise the "continuing persecution" argument in her appellate brief and the parties addressed it only briefly at oral argument in response to the Rule 28(j) supplemental citations submitted by the government one week earlier. Issues not adequately raised on appeal may be deemed waived. *See* Fed. R. App. P. 28(a) (requiring that an appellate brief contain a statement of the issues presented and that the argument contain the contentions of the appellant with respect to the issues presented, the reasons therefor, and citations to the authorities relied on); *see also Lewless v. Sec'y of Health & Human Servs.*, No. 93-1581, 1994 U.S. App. LEXIS 12261 at *12 (6th Cir. May 23, 1994) (holding that this court "is not obligated to consider unsupported arguments inadequately developed in the briefs" and citing federal circuit cases).

Finally, as discussed in Part II.B.1. above, substantial evidence supports the IJ's finding that Diallo's belated claim that she fears returning to Guinea is not credible. For all of these reasons, we decline to decide the "continuing persecution" issue.

### 3. *Political persecution*

Diallo also seeks asylum on the basis of political persecution. Substantial evidence, however, supports the IJ's findings that her claims of past political persecution and of a fear of future persecution are not credible. The evidence that the IJ found most credible, being the testimony of Diallo's cousin Lena Diallo, is based solely on information that the witness received from the petitioner herself. And although Diallo submitted letters from two individuals who attested that they were arrested with her, she did not produce any corroborating evidence that predates her asylum application tending to show that she actually protested, or that she was arrested, beaten, and raped.

Moreover, she did not experience any problems upon being returned to Guinea in the summer of 2002, despite attending classes at Nasser University. Her proffered evidence, in sum, does not compel a conclusion contrary to that of the IJ.

## C.       Withholding of removal and protection under the CAT

Because Diallo has not satisfied the requirements for asylum, she cannot meet the more stringent standards required to qualify for withholding of removal or for protection under the CAT. *See INS v. Cardoza-Foncesca*, 480 U.S. 421, 431-32 (1987) (holding that a petitioner who does not satisfy the asylum requirements for establishing past persecution or a well-founded fear of future persecution cannot meet the higher thresholds for the latter two forms of relief).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the BIA.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I would grant a rehearing by the panel because of the substantial issues raised by Cherif Diallo ("Diallo") in her petition for rehearing. The crucial issue in this case is whether the fact that the female genital mutilation that Diallo experienced is not likely to be repeated defeats her claim of a well-founded fear of future persecution. A burden-shifting framework governs applications for asylum. "The burden of proof is on the applicant for asylum to establish that he or she is a refugee . . . . The applicant may qualify as a refugee either because he or she has suffered past persecution *or* because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(a)-(b) (emphasis added). The applicant's testimony, "if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). "If an applicant establishes that he [or she] has suffered past persecution, there is a rebuttable presumption that he [or she] has a well-founded fear of future persecution." *Berri v. Gonzales*, 468 F.3d 390, 396 (6th Cir. 2006) (citing 8 C.F.R. § 208.13(b)(1)). "The INS may rebut that presumption by establishing, by a preponderance of the evidence, that conditions in the applicant's country have changed since the time of the persecution to such an extent that the applicant no longer has a well-founded fear of being persecuted if she were to return." *Rreshpja v. Gonzales*, 420 F.3d 551, 555 (6th Cir. 2005) (citing *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998)). Under this burden-shifting framework, the key questions in this case are twofold: whether Diallo suffered past persecution on account of her membership in a particular social group and, if so, whether the government met

- 17 -

its burden of showing "a fundamental change in circumstances."[1]  *See* 8 C.F.R.

§ 208.13(b)(1)(i)(A).

## I.  PAST PERSECUTION ON ACCOUNT OF DIALLO'S
## SOCIAL-GROUP MEMBERSHIP

Undeniably, Diallo's suffering female genital mutilation as a young child amounted to

past

persecution.  In *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004), we held that "[f]orced female

genital mutilation involves the infliction of grave harm constituting persecution on account of

membership in a particular social group that can form the basis of a successful claim for asylum."

*Id.* at 638 (citing *In re Fauziya Kasinga*, 21 I. & N. Dec. 357, 365 (BIA June 13, 1996)).  "Often

performed under unsanitary conditions with highly rudimentary instruments, female genital

mutilation is 'extremely painful,' 'permanently disfigures the female genitalia, [and] exposes the

girl or woman to the risk of serious, potentially life-threatening complications,' including

---

[1]The majority opinion cites the familiar standard that an asylum petitioner's "'well-founded fear must be both subjectively genuine and objectively reasonable.'"  Maj. Op. at ¶ 20 (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004)); *see also Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31, 440 (1987)).  Under the framework outlined in the Code of Federal Regulations, however, a petitioner bears the burden of meeting this standard only if she has not established past persecution or if she has established past persecution and the government has rebutted this evidence by showing changed country conditions. *See Ali v. Ashcroft*, 366 F.3d 407 (6th Cir. 2004) (holding that because the asylum applicant had not proved past persecution he was not entitled to a presumption of a well-founded fear of future persecution and had to establish such a "reasonable possibility" of persecution); *Ouda v. INS*, 324 F.3d 445, 450 (6th Cir. 2003) (same).

'bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus.'" *Id.* (quoting *Kasinga*, 21 I. & N. Dec. at 361). "Female genital mutilation can result in the permanent loss of genital sensation in the victim and the consequent elimination of sexual pleasure." *Id.* Diallo's testimony before the Immigration Judge ("IJ") lends personal detail to this court's general description of female genital mutilation. She recalled the extreme pain that she suffered during the course of the mutilation and in the weeks that followed. She also testified that as a result of the female genital mutilation performed on her she fears heterosexual intercourse.

Although we did not specifically delineate in *Abay* the parameters of the social group to which the petitioner in that case belonged, other decisions by the Sixth Circuit, the Board of Immigration Appeals ("BIA"), and the Tenth Circuit make clear that female members of a tribe or ethnicity may constitute a social group. The Sixth Circuit has adopted the BIA's definition of a social group set forth in *Matter of Acosta*, 19 I & N. Dec. 211, 233-34 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (1987). *Castellano-Chacon v. INS*, 341 F.3d 533, 546 (6th Cir. 2003). In *Acosta*, the BIA defined a social group as "a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience." *Castellano-Chacon*, 341 F.3d at 547 (quoting *Acosta*, 19 I & N. Dec. at 234). Both the BIA and the Tenth Circuit have applied the *Acosta* definition to determine that petitioners who experienced genital mutilation thereby suffered persecution on account of their

social-group membership. The BIA has held that young female members of a tribe who had not yet had and who opposed female genital mutilation constituted a social group, *Kasinga*, 21 I. & N. Dec. at 365, and the Tenth Circuit has similarly held in a genital-mutilation case that female members of a tribe constitute a social group. *Niang v. Gonzales*, 422 F.3d 1187, 1198-1200 (10th Cir. 2005) (requiring only gender or membership in tribe to identify social group). Because these opinions followed *Acosta*, as the Sixth Circuit does, I find them particularly persuasive. Certainly, both one's sex and one's ethnicity are immutable characteristics. Following the above opinions as well as our decision in *Abay*, we must conclude that Diallo's experience of female genital mutilation amounted to past persecution on account of her sex and membership in the Fulani ethnic group.

## II. THE GOVERNMENT'S REBUTTAL BURDEN REGARDING FUTURE PERSECUTION

Under the burden-shifting framework established by the Code of Federal Regulations, Diallo's experience of genital mutilation entitles her to a presumption of a well-founded fear of future persecution. The government's arguments in response to Diallo's petition for rehearing confuse the applicable standards in this case. First, the government argues that Diallo has waived the argument that she is eligible for asylum solely on the basis of past genital mutilation and that, regardless, the BIA has rejected the Ninth Circuit's view of genital mutilation as a "continuing violation" creating a fear of future persecution that the government cannot rebut. *See In re A-T*, 24 I. & N. Dec. 296, 299-301 (BIA 2007) (rejecting the Ninth Circuit's continuing-violation

theory of female genital mutilation).  Diallo, however, did not and did not need to argue that

genital mutilation constitutes a continuing violation.  Instead, under 8 C.F.R. § 208.13(b)(1)(i),

the government has the burden of rebutting the presumption that Diallo has a well-founded fear

of future persecution by proving either that the conditions in Guinea have fundamentally changed

or that Diallo could avoid persecution by relocating within Guinea.

The government proceeds to argue, second, that Diallo "failed to establish that she would

undergo [genital mutilation] again or that she otherwise has a well-founded fear of future

persecution."  Respondent's Opp. to Pet. for Rehr'g at 8.  The government's argument, however,

shifts the burden of establishing a well-founded fear of future persecution back onto Diallo when

the regulatory framework requires the government to rebut a presumption of this fear.  Arguing

that Diallo is not likely to undergo genital mutilation again artificially narrows the issue in this

case.  "The loss of a limb [is a] form[] of past persecution . . . routinely assessed under the past

persecution standards specified in the asylum and withholding of removal regulations." *In re A-T*, 24 I. & N. Dec. at 301.  We would not take seriously the argument that someone who lost a

limb in the course of persecution on account of his social-group membership categorically could

not establish a well-founded fear of future persecution only because he could not again lose that

same limb.  Diallo suffered past persecution because she is a Fulani female, and she is entitled to

a rebuttable presumption of a well-founded fear of future persecution on account of her sex and

ethnicity.

The majority opinion's suggestion that "the unique cultural underpinning behind FGM rebuts the presumption that a female will be subject to future persecution," maj. op. at ¶ 34, extends beyond existing law. The BIA's *In re A-T* decision, which rejected the Ninth Circuit's continuing-violation theory of female genital mutilation, did not state that past genital mutilation can *never* create a well-founded fear of future persecution. The BIA held only that the claim of past genital mutilation should be analyzed under the ordinary burden-shifting framework governing asylum claims. 24 I. & N. Dec. at 301. As I have explained above, under the applicable burden-shifting framework Diallo does not need to prove that she will undergo further genital mutilation in the future. Instead, the government has the burden of rebutting the presumption that she will again experience persecution on the basis of her sex and ethnicity.

Both the majority opinion and the Immigration Judge have also ignored the possibility that Diallo might be entitled to asylum even if the government successfully rebutted the presumption of a well-founded fear of future persecution. *See Mohammed v. Gonzales*, 400 F.3d 785, 801 (9th Cir. 2005); *In re A-T*, 24 I. & N. Dec. 296, 300 (BIA 2007). An asylum "applicant may qualify as a refugee either because he or she has suffered past persecution *or* because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b). If the government successfully rebuts the presumption of a fear of future persecution afforded applicants who have demonstrated past persecution, the decision-maker still has the discretion to grant asylum. The decision-maker may grant asylum if: 1) the petitioner has shown "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or"

2) the petitioner has shown "that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii)(A)-(B). I think that the severity of the persecution that Diallo suffered as a victim of past female genital mutilation would entitle her to consideration for asylum under this humanitarian exception.

Because the government has not met its burden of rebutting the presumption that Diallo has a well-founded fear of future persecution, I would grant Diallo's petition for rehearing, grant her petition for review, and remand to the BIA. I respectfully dissent.