NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0445n.06

No. 12-3199

FILED
Jun 18, 2014
DEBORAH S. HUNT, Clerk

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAHADATOU CISSE ABDRAMANE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| ERIC H. HOLDER, JR., Attorney General, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |

**BEFORE: SUHRHEINRICH, MOORE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner Sahadatou Cisse Abdramane, a native and citizen of Niger, appeals a final order of removal issued by the Board of Immigration Appeals (BIA), alleging that she will be subjected to circumcision, also known as female genital mutilation (FGM), by her parents if forced to return to Niger. AR 2–3. The BIA affirmed the decision of the Immigration Judge (IJ) denying Abdramane's applications for asylum under § 208(b)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1), withholding of removal under § 241(b)(3) of the Act, and protection under the United Nations Convention Against Torture (CAT) pursuant to 8 C.F.R. § 1208.16(c). AR 2. Abdramane challenges the IJ's credibility determination, the BIA's dismissal of her application for asylum and withholding of removal, and alleges a violation of due process. We AFFIRM the decision of the BIA and deny Abdramane's petition for review.

**I.**

Abdramane was admitted to the United States on an F1-student visa on January 1, 2004, as a nonimmigrant student to attend Xavier University in Cincinnati, Ohio. AR 365, 416. In February of 2004, Abdramane filed an application for asylum, withholding of removal, and protection under the regulations implementing CAT. AR. 111, 365–75.

On August 3, 2004, the Department of Homeland Security (DHS) served Abdramane with a Notice to Appear (NTA), charging her with being removable as an alien who, "after admission as a nonimmigrant under Section 101(a)(15) of the Act, . . . failed to maintain or comply with the conditions of the nonimmigrant status under which [she was] admitted." *See* 8 U. S. C. § 1227(a)(1)(c)(i) (2012). AR 416–17. On December 4, 2006, Abdramane submitted written pleadings admitting the factual allegations in the NTA and conceded removability as charged. AR 394, 403.[1] Abdramane submitted an updated application for asylum, withholding of removal, and CAT protection on August 8, 2008. AR 226–35.

Abdramane testified as follows. She was born in 1984 in Niamey, Niger, is a member of the Zarma ethnic race, and is Muslim. A.R. 97–98. Abdramane is single and has one son born in North Carolina in 2006. AR 98–99. Her mother and father are citizens of Niger, and she has a brother and younger sister. AR 100. Between 2002 and 2003, although already 18 or 19, Abdramane's parents began talking about circumcising her because of "tradition and custom," and a belief that she would otherwise bring shame on the family and be unable to get married, though she had no plans to marry in 2004. AR 102–03, 124–25, 142. She stated that if she returns to Niger, her parents will either circumcise her or kill her because "they can't stand and

---

[1] The IJ granted Abdramane's petition for change of venue from the Immigration Court in Cleveland, Ohio to the "Cincinnati, Ohio docket of the Arlington, Virginia Immigration Court." AR 393–95, 96.

look at me without doing what they want." AR 116. She expressed a fear that her son would

also be subjected to circumcision. AR 120.

Abdramane testified that female circumcision is "common" throughout Niger and

practiced "most of the time" in the Zarma tribe. 103, 133–34. Although she acknowledged that

in the Zarma tribe, female circumcision is generally practiced on younger girls, Abdramane

testified that it can be done from birth until age 35. AR 124.[2] Uneducated village ancestors, not

a doctor or medical personnel, perform the circumcisions. AR 104. When asked on cross-

examination about a 2009 Country Report stating that FGM in Niger decreased from 5 percent in

1998 to 2.2 percent in 2006, Abdramane testified that FGM is still practiced in her tribe. AR

134, 186. Notably, the 2009 Country Report cited by the government also states: "Certain ethnic

groups practiced FGM, predominantly the Fulani and Djerma [Zarma][3] in the western region."[4]

AR 186.

Abdramane refused to be circumcised and was not circumcised. AR 102, 104, 109. In

November and December of 2003, she ran away to her uncle's home in Niamey, Niger and lived

---

[2] Abdramane initially testified that it can be done before age 25, AR 103, but later stated that it can be done up until age 35. AR 124.
[3] Zarma is also spelled Djerma and is referred to that way in the 2009 Country Report. AR 186.
[4] The report states in pertinent part:

> FGM is against the law and punishable by six months to three years in prison. If an FGM victim dies, the practitioner can be sentenced to 10–20 years' imprisonment. Certain ethnic groups practiced FGM, predominantly the Fulani and Djerma in the western region. According to UNICEF, the FGM rate decreased from 5 percent in 1998 to 2.2 percent in 2006. However, an October 2008 UN IRIN report stated that circumcisers traveled from Burkina Faso to Niger to carry out FGM on nomad Gourmantche girls as part of a rising trend of crossborder FGM. FGM was practiced on young girls, and clitoridectomy was the most common form. The government actively combated FGM, continuing its close collaboration with local NGOs, community leaders, UNICEF, and other donors to distribute educational materials at health centers and participate in educational events. On April 7, as a result of an 18-month sensitization and training session provided by the Inter-Ministerial Committee for the Fight Against FGM and a local NGO, 10 villages in the Maklondi local council area near the border with Burkina Faso publically abandoned the practice of FGM. Such training was extended to 10 other villages in May.

AR 186.

with him briefly. Though her parents threatened to end their relationship with her uncle, he did not believe in circumcision and helped her to obtain the F1-student visa. AR 109–110. She testified that her uncle wrote a letter in support of her application but claimed that it arrived late and there was not time to have it translated. AR 123.

When Abdramane entered the United States in 2004, she did not have enough money to attend college. AR 111. She stayed with a friend of her uncle who helped her prepare and file her initial asylum application. *Id.* She could not speak or write English and was only able to review the application in language she understood. AR 111–12. She did not have a letter or affidavit from the individual who helped her prepare her initial asylum application. AR 137.

Abdramane has only spoken with her mother once since coming to the United States. AR 112. She testified that her mother called to harass her and said that wherever she goes, she is insulted by her friends, family members, and the ancestors, stating that Abdramane "better come back home, get it done." *Id.* Abdramane does not have contact information for her sister because her sister also ran away to escape circumcision in 2005 at the age of eleven or twelve, about a year and a half after Abdramane left. AR 106, 113, 129–30. Abdramane is in touch with her brother, who has lived in the Netherlands since 2009. AR 113–115. In a letter, he stated "If she were to return to Niger, she would be forced to go through this procedure even without her consent. If she would return and not go through this then they would shun her from the community and people would not accept her in our family. It would be hard for [her] to survive . . , and she would not be able to get married." AR 197.

Abdramane's mother was not subjected to circumcision; Abdramane testified that she did not know why. AR 106. Abdramane's cousin, who lives on the Ivory Coast, was circumcised before she was married. AR 105–06, 114, 257–58. Abdramane's brother told her that the

daughter of another cousin, between 12 and 13, was also circumcised after Abdramane was in the United States. AR 105–106. Other than her cousin and niece, she did not know anyone else who was subjected to FGM. AR 135.

Abdramane also produced a document from the "Great Priestess of the Village of Moussadeye," summoning Abdramane to appear before the "council of the Elders" by February 10, 2004 to "go under the Mandatory female genital Excision before Marriage." AR 115–16, 222. She did not produce the email, from a man she does not know, that attached the summons and did not contact her email service provider to obtain it. AR 137-39.

Abdramane testified that the authorities in Niger are trying their best but "until now nothing, they keep doing it." AR 106. She was aware that a few months prior the authorities arrested some women who performed circumcisions. AR 107. Abdramane explained that if she returned to Niger, she would have nowhere to live. She would not be able to live with her uncle because he asked her not to come back and her parents are waiting for her. AR 117, 122. She did not know whether the authorities in Niger would be unable to protect her, and she did not go to the authorities before she left in 2004. AR 117–118, 133. She further testified that the governmental authority in Niger could not do anything about the summons from the high priestess. AR 141.

At the conclusion of Abdramane's testimony, government counsel asked to submit the asylum officer's Assessment to Refer and the notes from the asylum interview "insofar as [he had] referenced her interview with the Asylum Officer, as rebuttal evidence or impeachment evidence." AR 143. Counsel for Abdramane objected on timeliness grounds, arguing that allowing the government to introduce them on the day of the hearing put Abdramane at a disadvantage because he was unable to review it with his client beforehand and because the

-5-

asylum officer was not present to testify and not subject to cross-examination. AR 143–44. The IJ marked the documents as an exhibit, but determined that because the asylum officer was not present, he would only "give it the weight it deems appropriate in this particular manner." AR 144. In his decision, the IJ noted that in light of Abdramane's "inconsistent evidence and testimony," although the asylum officer was not present, he nevertheless gave "some weight" to the asylum officer's interview assessment and notes. The IJ found that Abdramane had not testified in a plausible, consistent, or sufficiently detailed manner. AR 85.

On March 22, 2010, the IJ sustained the charge of removability and denied Abdramane's applications for asylum, withholding of removal, and CAT protection. AR 67, 86. On January 23, 2012, the BIA dismissed Abdramane's appeal. AR 2–3.

II.

Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). To the extent the BIA adopted the IJ's reasoning, this Court also reviews the IJ's decision. *Id*. Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the INA and accompanying regulations. *Id*. This court reviews both the IJ's and the BIA's factual findings under the substantial evidence standard. *Id*. We cannot reverse such findings simply because we would have decided the case differently. "These findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id*. (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also Bi Xia Qu v. Holder*, 618 F.3d 602 (6th Cir. 2010) ("This Court reviews the BIA's decision using the substantial-evidence-on-the-record standard, which requires this Court to uphold the BIA's decision unless it is manifestly contrary to law.").

III.

A. Credibility

Because Abdramane submitted her application for asylum prior to May 11, 2005, the amendments made to the INA by the REAL ID Act are inapplicable. *Matter of S-B-*, 24 I&N Dec. 42 (BIA 2006). Credibility determinations are findings of fact and are reviewed in pre-REAL ID Act cases under the "substantial evidence" standard. *Diallo v. Mukasey*, 268 F. App'x 373, 377 (6th Cir. 2008). "Even so, the IJ's conclusion must be supported by specific reasons that go to the heart of the applicant's claim." *Id*; *Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008). When an IJ decides an applicant's testimony "lacks credibility, the IJ must include in his or her decision 'specific reasons' explaining why the IJ reached such a conclusion.'" *Kocibelli v. Holder*, 340 F. App'x 264, 269 (6th Cir. 2009) (citing *Singh v. Ashcroft*, 398 F.3d 396, 402 (6th Cir. 2005)). "They cannot be based on an irrelevant inconsistency." *Koulibaly*, 541 F.3d at 620. Thus, if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility. *Id.* Credibility encompasses not just consistency, but also plausibility and sufficient detail. *Diallo*, 268 F. App'x at 377 (citing *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004)). Like other factual findings, a credibility finding will be reversed only if any reasonable adjudicator would be compelled to conclude to the contrary. *Id.* The applicant may be able to meet the burden of establishing refugee status through his or her own testimony, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Kocibelli*, 340 F. App'x at 268 (citing 8 U.S.C. § 1158(b)(1)(B)(ii)).

The IJ held that Abdramane was not credible because she had not testified in a plausible, consistent, or sufficiently detailed manner and did not provide a coherent account of her claim, explaining that there were numerous inconsistencies and contradictions in her testimony and finding that Abdramane's testimony concerning the prevalence of FGM in Niger was inconsistent with current country conditions. AR 85.

The BIA affirmed, holding that Abdramane's "account was inconsistent regarding the prevalence of female genital mutilation [] performed on females similarly situated to her, a matter that goes to the heart of her claim." AR 2. The BIA explained that Abdramane's testimony on the prevalence of FGM in Niger conflicted with State Department Country Reports[5] showing a drop in the FGM rate from 5 percent in 1998 to 2.6 percent in 2009, that Abdramane's mother was not circumcised, that Abdramane conceded that she did not know anyone except her cousin and a niece who were subjected to FGM, and that Abdramane provided inconsistent accounts of when her cousin was subjected to FGM and the stage of life FGM is performed. AR 2–3.[6]

Abdramane asserts that all of the inconsistencies and omissions were either minor or exaggerated. She also argues that the IJ's decision to admit the asylum officer's Assessment To Refer Memo and notes into evidence for impeachment purposes without prior notice was a violation of due process and prejudiced her. "The Assessment to Refer is a document prepared by an asylum officer who meets informally with the applicant, considers the documents presented with the asylum application, then decides whether asylum should be granted or whether the matter should be referred to an IJ for formal adjudication." *Koulibaly*, 541 F.3d at

---

[5] The BIA noted that State Department reports on country conditions are highly probative and usually the best source of information on conditions in foreign nations. *See Matter of H-L-H-& Z-Y-Z-*, 25 I&N Dec. 209 (BIA 2010).

[6] Notably, Abdramane fails to address any of the reasons cited by the BIA and instead only addresses reasons cited by the IJ that the BIA did not rely on.

620 (internal quotation marks and citations omitted). Because aliens have due process rights in removal proceedings, the Fifth Amendment provides some limits on what evidence can be admitted. *Kasa v. Gonzales*, 128 F. App'x 435, 440 (6th Cir. 2005). The due process test for admissibility of evidence in a deportation hearing is whether the evidence is probative and whether its use is fundamentally fair. *Sow v. Holder*, 444 F. App'x 871, 874 (6th Cir. 2011) (citing *Kasa*, 128 F. App'x at 440).

We need not reach either argument because even assuming arguendo that the BIA's affirmance of the IJ's credibility decision erroneously relied on inconsequential inconsistencies, and further that it was error to admit the Assessment to Refer and notes of the asylum officer, Abdramane's claim still fails because even accepting her testimony as credible, she failed to meet her burden of showing eligibility for asylum or withholding of removal.

Substantial evidence, independent of the Assessment to Refer and Abdramane's credibility, supports the IJ's determination that Abdramane is not eligible for asylum or withholding of removal.

## B. Eligibility for Relief

Abdramane bears the burden of proving eligibility for asylum and withholding of removal. 8 C.F.R. §§ 1208.13(a), 1208.16(b) (2013). A refugee is a person unable or unwilling to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Kante v. Holder*, 634 F.3d 321, 325 (6th Cir. 2011) (citing 8 U.S.C. § 1101(a)(42)(A)). "The persecution must be by the government, or persons the government is unwilling or unable to control." *Id*. (internal quotation marks omitted) (citing *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)).

"If past persecution is established, a rebuttable presumption arises that the applicant has a well-founded fear of future persecution, shifting the burden to the government to rebut the presumption by establishing that conditions in the applicant's home country have changed to such an extent that the applicant no longer has a well-founded fear of future persecution should she return." *Id.* (citing 8 C.F.R. § 1208.13(b)(1)). Alternatively, an applicant can demonstrate a well-founded fear of future persecution by showing that she has a genuine fear and that a reasonable person in her circumstances would fear persecution on account of a statutorily-protected ground if she returned to her native country. *Id.* The applicant's well-founded fear must be both subjectively genuine and objectively reasonable. *Diallo v. Muskasey,* 268 F. App'x 373, 377 (6th Cir. 2008); *Pilica*, 388 F.3d at 950; *see also Kante*, 634 F.3d at 325; *Perkovic v. INS*, 33 F.3d 615, 620–21 (6th Cir.1994). "An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii); *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1154 (6th Cir. 2010).

A request for asylum is considered a request for withholding of removal as well. *See* 8 C.F.R. § 1208.3(b); *INS v. Stevic*, 467 U.S. 407, 420 n.13 (1984). Unlike the discretionary relief of asylum, a grant of withholding of removal is mandatory if an applicant proves that her "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." *Khalili*, 557 F.3d at 435 (citing 8 U.S.C. § 1231(b)(3)(a)). An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum and must demonstrate that there is a clear probability that he will be subject to persecution if forced to return to the

country of removal. *Khalili*, 557 F.3d at 435–36 (citing *Singh*, 398 F.3d at 401). Where an alien

fails to satisfy eligibility for asylum, she also necessarily fails to satisfy the higher burden of

withholding of removal. *See Stevic*, 467 U.S. at 425.

The IJ held that because Abdramane had not met her burden of establishing past

persecution, she was not entitled to a presumption of a well-founded fear of future persecution,

and her subjective fear of future persecution was not objectively reasonable. AR 84–85. The IJ

explained that Abdramane never reported any of the alleged threats of FGM to the police, never

sought their protection, and failed to show that authorities in Niger would not protect her against

FGM. AR 81–85. The IJ further noted that Abdramane only knew of two individuals subjected

to FGM, and that neither she nor her mother and sister were circumcised. AR 81–83. The BIA

affirmed the decision, ruling that even assuming Abdramane was credible, she failed to satisfy

her burden of proving eligibility for asylum and the higher burden for withholding of removal.

AR 2.[7]

Abdramane does not allege past persecution. She argues that she would suffer FGM by

her parents and ethnic group if she returned to Niger. However, Abdramane fails to show an

objective fear that the authorities in Niger will be unable or unwilling to prevent her parents from

subjecting her to FGM or that she cannot reasonably relocate to a part of Niger where she will be

safe from FGM.

Substantial evidence supports the IJ's finding that Abdramane failed to establish a claim

for asylum or withholding of removal. Abdramane claims that her parents will subject her to

FGM. When an asylum claim focuses on non-governmental conduct, its fate depends on some

showing either that the alleged persecutors are aligned with the government or that the

---

[7] The BIA adopted and affirmed the IJ's conclusion.

government is unwilling or unable to control them. *Khalili*, 557 F.3d at 436. Abdramane testified that she never went to the authorities in Niger to seek protection from FGM and acknowledged that the authorities have arrested persons for practicing FGM. Although Abdramane testified that FGM is an ongoing problem in Niger, and the State Department's Country Reports indicate that FGM is an ongoing problem among members of the Zarma tribe, the reports also document a significant decrease in the percentage of girls subject to FGM in Niger, from 5 percent to 2.6 percent as of 2009, and that perpetrators of FGM are being prosecuted by the government. Based on this record, we cannot conclude that a reasonable adjudicator would be compelled to find that the government of Niger was unwilling or unable to protect Abdramane. *See id.* (finding petitioner could not establish that the government was unwilling or unable to control family members and protect him from honor killings where State Department Country Report indicated that Jordanian authorities prosecuted all fifteen honor crimes reported in 2004 and placed potential victims in protective custody); *Ralios Morente v. Holder*, 401 F. App'x 17, 24 (6th Cir. 2004) (holding Morente did not demonstrate a well-founded fear of future persecution where he did not report threats to police and State Department Country Report did not directly indicate that the government would be unable or unwilling to control former guerilla members Morente feared, and instead reported that the government regularly provided security for human rights activists); *compare Abay v. Ashcroft*, 368 F.3d 634, 640 (6th Cir. 2004) (holding that nine-year-old child established she was a refugee under the Act where she was from a country where the practice of FGM was "nearly universal," with 90% of females having been subjected to some form of it, noting that even if her parents did not practice FGM, she would not be able to prevent a future husband or his relatives from demanding that it

be done). Here, there is little, if any, evidence supporting that the government would be unwilling or unable to protect Abdramane from harm. *See Khalili*, 557 F.3d at 436.

Further, because Abdramane has not established past persecution and does not argue that the persecution is by the government or government-sponsored, she bears the burden of establishing that it is not reasonable for her to relocate. 8 C.F.R. § 1208.13(b)(2)(ii); *see Ghanim v. Holder*, 425 F. App'x 463, 467–68 (6th Cir. 2011). Abdramane has failed to show that she could not reasonably relocate in Niger where she would be safe from her parents and other members of her tribe. *See Maritim v. Holder*, 507 F. App'x 558, 560 (6th Cir. 2012) (holding applicant failed to show fear of future persecution where, although 48% of women in her father's tribe were subjected to FGM, she failed to establish that relocation within Kenya was not reasonable, the Kenyan government did not support FGM, her mother and sisters were never subjected to FGM, and her parents *opposed* the practice); *Cruz-Samayoa*, 607 F.3d at 1154 (denying asylum and withholding of removal where, although applicants might face some risk of future harm at the hands of the father's enemies as a result of his political activism, they failed to show they could not reasonably relocate outside their small town in Guatemala where they would be safe); *Kian Hau Ng v. Holder*, 447 F. App'x 655, 658 (6th Cir. 2011) (holding that applicant failed to show future persecution where he could relocate to other regions of Indonesia, and there was no evidence that the persecution he allegedly feared existed nationwide).

Since Abdramane cannot satisfy the standard for asylum, it follows she cannot meet the more stringent standard for withholding of removal. *See Ralios Morente*, 401 F. App'x at 24 (citing *Ndrecaj v. Mukasey*, 522 F.3d 667, 677 (6th Cir. 2008)).

We DENY Abdramane's petition for review.